**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DAVID WILLIAM ARNOLD,**

                                    **Plaintiff,**

            **vs.**                                                    **5:10-cv-1043**
                                                                        **(MAD/ATB)**

**DAMIAN ULATOWSKI,**
*Supervisor of the Town of Clay*,

                                    **Defendant.**
_____

**APPEARANCES:**                            **OF COUNSEL:**

**DAVID WILLIAM ARNOLD**
9411 Horseshoe Island Road
Clay, New York 13041
Plaintiff *pro se*

**HANCOCK & ESTABROOK, LLP**            **LINDSEY H. HAZELTON, ESQ.**
1500 AXA Tower I, 100 Madison Street
Syracuse, New York 13221
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

On August 30, 2010, Plaintiff commenced this action, alleging violations of his First and Fourteenth Amendment rights, as well as violations of his rights secured by Article I, sections 8, 9 and 11 of the New York State Constitution. *See* Dkt. No. 1. On January 3, 2011, United States District Judge David N. Hurd issued an order dismissing all claims and Defendants, except for Plaintiff's First Amendment claim against Defendant Ulatowski. *See* Dkt. No. 21 at 1-2.

Currently before the Court is Defendant's motion for summary judgment as to Plaintiff's remaining claim. *See* Dkt. No. 41.

## II. BACKGROUND

Plaintiff is a life-long resident of the Town of Clay (the "Town") and he frequently attends and speaks at Town Board Meetings.  In the spring of 2010, the Town of Clay sought to change the zoning on land the Town owned in an area generally known as "Three Rivers Point" from a mix of Industrial, Residential and Agricultural uses to a "Planned Development District" ("PDD"). According to Defendant, the specific zone change to PDD had been recommended by New York State as a condition of eligibility surrounding the provision of state grants for continued environmental remediation efforts in the Three Rivers area.

Prior to the zone change, the Town published the proposed zone change in the local newspapers and through a website, and held a public hearing to discuss the issue as part of its June 7, 2010 Town Board Meeting.  Although Plaintiff did not attend this meeting, various other residents were in attendance and asked questions regarding the proposed zone change.  The public hearing was adjourned pending a recommendation from the Town Planning Board, and was scheduled to be continued on June 21, 2010.

On June 9, 2010, the Town Planning Board met and reviewed the proposed Three Rivers zone change to PDD and unanimously voted to recommend this change to the Town Board.  The public hearing was formally continued at the June 21, 2010 meeting.  Defendant began this agenda item by explaining to the audience that the matter had been adjourned to obtain the Town Planning Board's recommendation and that it had unanimously recommended the change to PDD. The Town Attorney, Robert Germain, then gave a brief overview of the proposed zone change advanced initially at the June 7, 2010 meeting, including the fact that the zone change was a required element in the Town's eligibility for soil remediation grants from the State and that it was always the Town's intention to change the zone to PDD on these lands.

2

When Mr. Germain was finished, Defendant then stated that he intended to close the public hearing.  At this point, Plaintiff stood up and stated that he had comments to make.  *See* Dkt. No. 41-1 at 25.[1]  Plaintiff stated in his deposition that he first reiterated a point made by another Town resident, Robert Edick, then "blasted the Town for about a minute and a half" and then stated "'[o]kay, enough of my tirade'" and proceeded to "'comment on the question at hand[.]'"  *See id.* at 28-32.  At one point, Mr. Germain interjected and tried again to explain the purpose of the zone change.  *See id.* at 81.  After expressing the fact that he was against the zone change, Plaintiff ended his comments by stating that "'[y]ou may be able to close this hearing without lettering me speak, but by no means is this the end of this matter, in fact, it's just the beginning.  I'll see you in court.'"  *See id.* at 82.

In support of his motion for summary judgment, Defendant argues that, (1) Plaintiff lacks standing to pursue his First Amendment claim because his right to freedom of speech was not denied and that he has failed to establish that Defendant's conduct had a "chilling effect" on his speech; (2) the meeting was a limited public forum and Defendant's actions amounted to viewpoint neutral and reasonable restrictions on Plaintiff's speech; and (3) he is entitled to qualified immunity.  *See* Dkt. No. 41-5.


### III. DISCUSSION

A.      **Summary judgment standard**

A court may grant a motion for summary judgment only if "the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue

---

[1] Plaintiff states that Defendant did not give him the floor to address the Town Board, as Defendant contends and as is reflected in the meeting's minutes.  *See* Dkt. No. 41-1 at 26.  Rather, Plaintiff asserts that he "took it."  *See id.*

warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at 36-37 (quotation and other citation omitted).

Furthermore, in assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable factual inferences in favor of the nonmoving party.  *See id.* at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's statement of material facts; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003).


**B.     42 U.S.C. § 1983**

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).  Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)).  As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each

defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).


**C.**    **First Amendment jurisprudence**

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  It is "common ground" that the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647 (1981).  A violation occurs only when the restricted speech is constitutionally protected and when the government's justification for the restriction is insufficient. *See Frisby v. Schultz*, 487 U.S. 474, 479 (1988).

The Supreme Court has set forth a three-step, forum-based test for determining whether a state actor violated a plaintiff's First Amendment right to free speech. *See Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 797 (1985).  Pursuant to this test, the court must determine "(1) whether plaintiff's speech is protected by the First Amendment; (2) the nature of the forum: public, designated or limited public, or nonpublic; and (3) whether the defendant's justifications for limiting the plaintiff's speech satisfy the requisite standard." *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 200 (D. Conn. 2005) (citing *Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 797, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)).

### 1. Protected speech

The First Amendment's protection of free speech, made applicable to the states through the Fourteenth Amendment, extends to a broad range of speech and expressive conduct.  *See, e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995). Speech on public issues and political matters lies at the heart of protected speech.  *See Morris*, 196 F.3d at 111 (quotation omitted).

It is clear that Plaintiff's speech, *i.e.* speaking at a public hearing to express his dissatisfaction with a government proposal and elected officials, constitutes a matter of public concern protected by the First Amendment.

### 2. Forum analysis and application of the applicable standard

The appropriate level of judicial scrutiny depends on the nature of the forum subject to the regulation.  "'Traditional public fora'" are places such as "streets and parks which 'have immemorially been held in trust for the use of the public, and . . . have [generally] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939)).  "Speech finds its greatest protection in traditional public fora, and government may not alter their public status without completely changing the fora's use, *e.g.* converting a public park to an office building." *Make the Road By Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004).  "Content-based restrictions on speech in traditional public fora are subject to strict scrutiny."  *Hotel Employees & Rest. Employees Union Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (citations omitted).  "The government may, however, impose content-

neutral time, place and manner restrictions on speech in a traditional public forum so long as those restrictions are 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications.'" *Id.* (quotation omitted); *see also Make the Road By Walking, Inc.*, 378 F.3d at 142 (citations omitted).

A designated public forum is a nonpublic forum the government intentionally opens to expressive activity for a limited purpose, such as use by certain groups or use for discussion of certain subjects. *See Perry Educ. Ass'n*, 460 U.S. at 46.  "Courts have held that a designated public forum exists when a governmental body affords the public an opportunity to address the body at its meeting." *Piscottano*, 396 F. Supp. 2d at 201 (citations omitted).  Although the government may decide to close a designated public forum, "so long as a forum remains public, government regulation of speech within it 'is subject to the same limitations as that governing a traditional public forum.'" *Make the Road by Walking, Inc.*, 378 F.3d at 143 (quotation omitted).

The courts further distinguish between limited designated public forums and unlimited designated public forums. *See, e.g., N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128 & n.2 (2d Cir. 1998) (quoting *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991)).  A "limited public forum is a subset of the designated public forum [that] arises '"where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects."'" *Make the Road By Walking, Inc.*, 378 F.3d at 143 (quotations omitted).  "In limited public fora, strict scrutiny is accorded only to restrictions on speech that falls within the designated category for which the forum has been opened." *Hotel Employees & Rest. Employees Union Local 100 of N.Y.*, 311 F.3d at 545 (citations omitted). "'Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively

deny access for other activities of that genre.'"  *Id.* at 545-46 (quotation omitted).  If the expressive activity does not fall within the limited category for which the forum has been opened, however, restrictions on speech need only be reasonable and viewpoint neutral.  *See id.* at 546 (citations omitted).

The final category, *i.e.* non-public fora, include all remaining public property that has not been opened to the public for expressive activity.  *See id.* (citation omitted).  Speech may be restricted in nonpublic fora so long as the restriction is reasonable and viewpoint neutral.  *See id.* (citation omitted).

As Defendant correctly notes, "[c]ourts have generally held that a public meeting of an elected municipal board . . . is a limited public forum for purposes of First Amendment analysis." *Malta v. Slagle*, No. 05-CV-342S, 2007 WL 952045, *3 (W.D.N.Y. Mar. 29, 2007) (citing *Bronx Household of Faith v. Board of Educ. of City of New York*, 400 F. Supp. 2d 581, 590-91 (S.D.N.Y. 2005)[2] (analyzing a city school board meeting as a limited public forum); *Gagnon-Smith v. City of Middletown*, 2004 WL 725666 (D. Conn. May 24, 2004) (analyzing a city common council meeting as a limited public forum); *Devine v. Vill. of Port Jefferson*, 849 F. Supp. 185 (E.D.N.Y. 1994)).  Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Defendant's action in ending discussion at the public meeting was viewpoint neutral and a reasonable restriction necessary to maintain order.  *See Malta*, 2007 WL 952045, at *4.

Plaintiff does not allege that he attempted to speak at the public hearing prior to Defendant announcing that he was going to close the hearing or that Defendant prevented him

---

[2] The Court notes that *Bronx Household of Faith* was vacated and remanded on other grounds.  *See Bronx Household of Faith v. Board of Educ. of City of New York*, 492 F.3d 89 (2d Cir. 2007).

from speaking prior to this announcement.  *See* Dkt. No. 41-1 at 24-26.  When Defendant

announced that he was closing the public hearing, Plaintiff states that the following ensued:  "I

blew my cork and I laid into him.  I probably spoke for a minute or a minute and a half on what I

thought of him and the town board."  *See id.* at 25.  Thereafter, Plaintiff testified as to the

following regarding the incident in question:

> And when you get me going, you're not going to shut me up.  It's
> that simple.  They would have had to have brought in ten cops to
> pull me out of there once I got rolling.  This was 15 years of pent-up
> anger and one thing that I will protect more than anything in this
> world is my freedom of speech and when he stated he was closing
> that hearing without letting me speak, that hit a button inside of me
> and I probably said things I shouldn't have said, but when I get
> angry, I say things that I mean and I will never retract what I say.

*See id.* at 26.  Plaintiff admits that, during this exchange, he was angry, that he was speaking

loudly, and that, when he gets upset in the manner that he was at the public hearing, he tends to

"scare" certain people.  *See id.* at 26-27.  Further, Plaintiff admits that, during his "tirade," he

made clear that he was against the proposed zone change.  *See id.* at 34.

　　　　Plaintiff goes on to further explain that "[a]fter I blasted the Town for about a minute and a

half, that's when I stated, 'Okay, enough of my tirade,' I think I said.  I said, 'Now I would like to

comment on the question at hand,' I think I said, which meaning, the hearing of the PDD zone

change request."  *See id.* at 30.  Plaintiff claims that, after his "tirade," Defendant stated again that

he was "closing the hearing, to which Plaintiff responded that "'I haven't even started yet.'"  *See id.*

at 31.  At his deposition, the following dialogue occurred:

> Q.　　But didn't you just tell me a minute ago that part of what you
> 　　　stood up and said was you were concerned based similarly to
> 　　　what Mr. Edick said, that your concern was of the
> 　　　uncertainty, and that, you know, I refer to what he said, "I
> 　　　have a hard time supporting something when I didn't know

what was going to go there."  That was what you were
objecting to that night; correct?

A.      That is correct, yes.

Q.      Okay.  Do recall that during or immediately following parts
of your tirade, did Mr. Germain get up again and try to
explain about the PDD, and the - - the grant money?

A.      He did.

*See id.* at 34.  Finally, Plaintiff admits that he, at least once and perhaps more than once,

expressed the fact that he was "'against the zone change'" and that he "'didn't see the need for it.'"

*See id.* at 34-35.

Based on the foregoing, the Court finds that it is clear that Plaintiff expressed his views

regarding the proposed zoning change at the public meeting and that Defendant ended the public

meeting after allowing Plaintiff to "rant" for about a minute and a half.  The fact that Plaintiff,

with more time to prepare his remarks, would have said more in opposition to the zone change is

irrelevant.  Defendant had the discretion to cut off Plaintiff's speech, which was composed mostly

of irrelevant, personal attacks against Defendant and the Town in general, done in an admittedly

hostile and angry manner.  *See, e.g., Kirkland v. Luken*, 536 F. Supp. 2d 857, 875-76 (S.D. Ohio

2008) (holding that there was no First Amendment violation where the speaker's microphone was

turned off and the speaker was removed from a public hearing for using inappropriate language

and shouting); *Scroggins v. City of Topeka*, 2 F. Supp. 2d 1362, 1374-75 (D. Kan. 1998) (holding

that there was no First Amendment violation when the speaker was removed from a public

hearing after he verbally attacked the hearing chair); *see also Collinson v. Gott*, 895 F.2d 994,

1000 (4th Cir. 1990) (Philips, J., concurring).

Accordingly, the Court grants Defendant's motion for summary judgment and dismisses Plaintiff's complaint.

**D.     Qualified immunity**

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis in original). "Where the right at issue in the circumstances confronting police officers . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to believe their acts did not violate those rights.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New*

11

*York*, 612, F.3d 149, 165 (2d Cir. 2010) (citations omitted).  "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. . . .  That is, '[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.'"  *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact.  *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted).  "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court.  However, '[a] contention that . . . it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'"  *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court.  *See id.* at 368 (citation omitted).  Any unresolved factual issues, however, must be resolved by the jury.  *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted).  Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

In the present matter, even assuming that the record now before the Court can be construed to support an otherwise cognizable First Amendment claim, it is clear that Defendant is entitled to qualified immunity.  In light of Plaintiff's admission that he went on a "tirade" and that he did, in fact, express his opposition to the planned zone change, it was objectively reasonable for Defendant to believe that he was not violating any of Plaintiff's clearly established rights.  This is especially true in light of the fact that Defendant attempted to close the meeting before Plaintiff ever made a request to speak and because the Town Board already conducted a public hearing on June 7, 2010, where it accepted comments from the public on the proposed action.

Based on the foregoing, the Court finds that, in the alternative, Defendant is entitled to qualified immunity.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment is **GRANTED** in its entirety; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: April 4, 2012
      Albany, New York

Mae A. D'Agostino
U.S. District Judge